1

**CANDIS MITCHELL**
California Bar No. 242797

2

**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900

3

San Diego, California 92101-5008
Telephone: (619) 234-8467

4

Candis_Mitchell@fd.org

5

6

Attorneys for Mr. Rudolfo Torrez

7

8

9

UNITED STATES DISTRICT COURT

10

SOUTHERN DISTRICT OF CALIFORNIA

11

**(HONORABLE LARRY A. BURNS)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 08CR1008-LAB |
| | ) | |
| Plaintiff, | ) | DATE: MAY 19, 2008 |
| | ) | TIME: 2:00 P.M. |
| v. | ) | |
| | ) | |
| **RUDOLFO TORREZ**, | ) | STATEMENT OF FACTS AND |
| | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| Defendant. | ) | |

**I.**

**STATEMENT OF FACTS[1]**

**A.     Arrest**

On March 3, 2008, at 4:55 a.m. Border Patrol Agent Denning was working at the "CHP Lot," an area 100 yards north of the International Border and one mile east of the Otay Mesa Port of Entry. Infrared scope operator, Border Patrol Agent Ruffner, saw four people traveling north from the border. Agent Denning detained the individuals that Agent Ruffner saw. After detaining and questioning the individuals while they were riding in the car to the border patrol station, it is alleged that they all made statements

---

1. The following is based primarily upon information supplied through Government discovery. Mr. Torrez does not stipulate to its accuracy and reserves the right to challenge it at future proceedings.

1  indicating that they did not have immigration documents to enter or remain in the United States. It is alleged

2  that Mr. Torrez was a member of that group.

3  **B.    Interrogation**

4      Following his arrest, Mr. Torrez was read his Miranda rights on at 11:55 a.m. by Border Patrol Agent

5  Denning. It is alleged that Mr. Torrez waived his rights but also stated that he was under the influence of

6  heroin. Questioning then ceased and Mr. Torrez was once again informed of his Miranda rights at 2:45p.m.

7  At this time, Mr. Torrez invoked his rights to remain silent.

8  **C.    Indictment**

9      On April 2, 2008, an indictment was handed down charging Mr. Torrez with violating 8 U.S.C.

10  §1326 (a) and (b), deported alien attempting to enter the United States who had been removed subsequent

11  to December 13, 2005

12      These motions follow.

13  **II.**

14  **MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

15      Mr. Torrez moves for the production of the following discovery. This request is not limited to those

16  items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody,

17  control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v.

18  Bryan, 868 F.2d 1032 (9th Cir. 1989).

19      To date, *defense counsel has received 55 pages of discovery*. Mr. Torrez respectfully requests that

20  the Government be ordered to produce discovery because Mr. Torrez has reason to believe that he has not

21  received all the discoverable material in his case. For example, Mr. Torrez has received no documentation

22  establishing that he was ever deported. Mr. Torrez **specifically requests production of a copy of the taped**

23  **proceedings and any and all documents memorializing the deportation proceeding allegedly held and**

24  **any other proceedings that the Government intends to rely upon at trial**. This request includes

25  discovery of materials known to the Government attorney, as well as discovery of materials which the

26  Government attorney may become aware of through the exercise of due diligence. See FED. R. CRIM. P. 16.

27      Mr. Torrez additionally requests that the Court order the Government to allow him the opportunity

28  to review his A-file in its entirety. First, the A-file contains documentation concerning his alleged

1  deportation. Part of Mr. Torrez defense may be that his underlying deportation was invalid. The documents

2  in the A-file would help illuminate the validity or futility of such a defense. For example, A-file documents

3  typically contain biographical information. Such information is essential to determining whether Mr.

4  Torrez's deportation was invalid.

5       Second, the Government will likely try to show at trial that a government officer searched the A-file

6  and did not find an application by Mr. Torrez for permission to enter the United States. Mr. Torrez

7  anticipates that the Government will attempt to admit a "Certificate of Non-Existence of Record" against

8  him, arguing that if Mr. Torrez had ever applied for permission to enter the United States, such an

9  application would be found in the A-file and because such an application is not in the A-file, Mr. Torrez

10  must not have applied for permission to enter the United States.

11       Although the certificate might be admissible, the question of the thoroughness of the search

12  conducted by the Government of the A-file is, and should be, open to cross-examination. United States v.

13  Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation."). Mr. Torrez should

14  be able to review his A-file in order to see whether any application for lawful admission exists. Moreover,

15  Mr. Torrez should also be able to verify whether other documents that would ordinarily be in the A-file are

16  "non-existent," or otherwise missing from his A-file. Mr. Torrez may assert a defense that his application

17  for lawful entry was lost or otherwise misplaced by the Government. He must be allowed the opportunity

18  to review his A-file and the manner in which it is being maintained by the Government in order to present

19  this defense. **A proposed order is attached for the court's convenience.**

20       In addition, Mr. Torrez moves for the production of the following discovery:

21       1. **Mr. Torrez's Statements.** The Government must disclose to Mr. Torrez all copies of any written

22  or recorded statements made by Mr. Torrez; the substance of any statements made by Mr. Torrez which the

23  Government intends to offer in evidence at trial; any response by Mr. Torrez to interrogation; the substance

24  of any oral statements which the Government intends to introduce at trial and any written summaries of Mr.

25  Torrez's oral statements contained in the handwritten notes of the Government agent; any response to any

26  Miranda warnings which may have been given to Mr. Torrez; as well as any other statements attributed to

27  Mr. Torrez. FED. R. CRIM. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to

28  Rule 16 make clear that the Government must reveal all Mr. Torrez's statements, whether written or oral,

regardless of whether the Government intends to make any use of those statements. **Mr. Torrez specifically requests all audio and videotaped copies of his statements and any rough notes taken pertaining to the substance of his statements.**

2. **Arrest Reports, Notes and Dispatch Tapes.** Mr. Torrez also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Torrez or any other discoverable material is contained. Such material is discoverable under FED. R. CRIM. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Torrez. See FED. R. CRIM. P. 16(a)(1)(B) and (c), FED. R. CRIM. P. 26.2 and 12(i).

3. **Brady Material**. Mr. Torrez requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Torrez on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case. Under Brady, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

4. **Any Information That May Result in a Lower Sentence Under The Guidelines.** Notwithstanding the advisory nature of the sentencing guidelines, the Government must produce this information under Brady v. Maryland, 373 U.S. 83 (1963), because it is exculpatory and/or mitigating evidence relevant to a possible future determination with respect to sentencing.

5. **Mr. Torrez's Prior Record.** Mr. Torrez requests disclosure of his prior record. FED. R. CRIM. P. 16(a)(1)(B).

6. **Any Proposed 404(b) Evidence.** Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d

1    822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4

2    F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

3        This request includes any "TECS" records as well as any other record(s) of prior border crossings

4    (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, as

5    impeachment, or in its rebuttal case.  Although there is nothing intrinsically improper about prior border

6    crossings (except, as here, where there are allegations of undocumented status), they are nonetheless subject

7    to 404(b), as they are "other acts" evidence that the government must produce before trial.  United States

8    v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

9        The defendant requests that such notice be given three weeks before trial to give the defense time

10   to adequately investigate and prepare for trial.

11        7.  **Evidence Seized.**  Mr. Torrez requests production of evidence seized as a result of any search,

12   either warrantless or with a warrant.  FED. R. CRIM. P. 16(a)(1)(c).

13        8.  **Request for Preservation of Evidence.**  Mr. Torrez specifically requests the preservation of all

14   physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the

15   Government and which relates to the arrest or the events leading to the arrest in this case.  This request

16   includes, but is not limited to, the results of any fingerprint analysis, Mr. Torrez's personal effects, and any

17   evidence seized from Mr. Torrez.

18        9.  **Henthorn Material.**  Mr. Torrez requests that the Assistant United States Attorney ("AUSA")

19   assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved

20   in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 419 (1995) (holding that "the

21   individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

22   Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

23   1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

24   conduct examination of records; appropriate Government agency may review files and notify AUSA of

25   contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

26   Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

27        10.  **Tangible Objects.**  Mr. Torrez requests the opportunity to inspect, copy, and test, as necessary,

28   all other documents and tangible objects, including photographs, books, papers, documents,  fingerprint

1  analyses, or copies of portions thereof, which are material to the defense, intended for use in the

2  Government's case-in-chief, or were obtained from or belong to Mr. Torrez. FED. R. CRIM. P. 16(a)(1)(c).

3  **Specifically, Mr. Torrez requests copies of the audio tapes of his alleged prior deportations or**

4  **removals.**

5      11. **Expert Witnesses.** Mr. Torrez requests the name, qualifications, and a written summary of the

6  testimony of any person that the Government intends to call as an expert witness during its case in chief.

7  FED. R. CRIM. P. 16(a)(1)(E).  The defense requests the notice of expert testimony be provided at a minimum

8  of two weeks prior to trial so that the defense can properly prepare to address and respond to this testimony,

9  including obtaining its own expert and/or investigating the opinions, credentials of the Government's expert

10  and a hearing in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho

11  Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and must determine,

12  reliability and relevancy of expert testimony and such determinations may require "special briefing or other

13  proceedings").

14      12. **Evidence of Bias or Motive to Lie.**  Mr. Torrez requests any evidence that any prospective

15  Government witness is biased or prejudiced against Mr. Torrez, or has a motive to falsify or distort his or

16  her testimony.

17      13. **Impeachment Evidence.**  Mr. Torrez requests any evidence that any prospective Government

18  witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness

19  has made a statement favorable to Mr. Torrez.  See FED. R. EVID. 608, 609 and 613; Brady v. Maryland.

20      14. **Evidence of Criminal Investigation of Any Government Witness.**  Mr. Torrez requests any

21  evidence that any prospective witness is under investigation by federal, state or local authorities for any

22  criminal conduct.

23      15. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.**

24  Mr. Torrez requests any evidence, including any medical or psychiatric report or evaluation, that tends to

25  show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired,

26  and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an

27  alcoholic.

28      16. **Witness Addresses.**  Mr. Torrez requests the name and last known address of each prospective

Government witness.  Mr. Torrez also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **Name of Witnesses Favorable to Mr. Torrez.**  Mr. Torrez requests the name of any witness who made an arguably favorable statement concerning Mr. Torrez or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **Statements Relevant to the Defense.**  Mr. Torrez requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. **Jencks Act Material.**  Mr. Torrez requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Torrez to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963).  In United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

20. **Giglio Information  & Agreements Between the Government and Witnesses.**  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Torrez requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment.

21. **Agreements Between the Government and Witnesses.**  Mr. Torrez requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the

witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

22. **Informants and Cooperating Witnesses.** Mr. Torrez requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Torrez. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Torrez. Brady v. Maryland, 373 U.S. 83 (1963)

23. **Bias by Informants or Cooperating Witnesses.** Mr. Torrez requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

24. **Scientific and Other Information.** Mr. Torrez requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case. See Rule 16(a)(1)(D).

25. **Residual Request.** Mr. Torrez intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Torrez requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

**III.**

**THIS COURT SHOULD DISMISS THE INDICTMENT FOR ITS FAILURE TO ALLEGE
ESSENTIAL ELEMENTS OF THE OFFENSE**

Mr. Torrez has been charged with attempted entry, a violation of Title 8 U.S.C. § 1326. The indictment fails to state an offense, since it does not allege that Mr. Torrez committed an overt act -- a required element in "attempt" cases. See United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1196 (9th Cir. 2000) (en banc). The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or

otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend.

V. An indictment's failure to "recite an essential element of the charged offense is not a minor or technical

flaw . . . but a fatal flaw requiring dismissal of the indictment." United States v. Du Bo, 186 F.3d 1177, 1179

(9th Cir. 1999); see also, United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001).

The Ninth Circuit has recently held that "failure to allege any specific overt act that is a substantial

step toward entry is a fatal defect in an indictment for attempted entry following deportation under 8 U.S.C.

§1326." United States v. Resendiz-Ponce, 425 F.3d 729 (9th Cir. 2005).

**A.    The Commission of an Overt Act Is a Required Element in "Attempt Crimes"**

An overt act is required to protect the innocent from conviction for merely thinking about committing

a crime. "The common law meaning of 'attempt' is the specific intent to 'engage in criminal conduct and

... an overt act which is a substantial step towards committing the crime.'" Gracidas-Ulibarry, 231 F.3d at

1192, citing United States v. Arbelaez, 812 F.2d 530, 534 (9th Cir.1987); accord United States v. Bailey,

444 U.S. 394, 405 (1980); Wooldridge v. United States, 237 F. 775, 778-79 (9th Cir.1916) (collecting

common law sources "holding that, to constitute an attempt, there must be the intent to commit a crime and

some act done toward its consummation, and that the term 'attempt' signifies both an act and the intent with

which it is done"); 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 6.2, at 18 (1986)

("The crime of attempt . . . [at] common law . . . consists of:  (1) an intent to do an act or to bring about

certain consequences which would in law amount to a crime;  and (2) an act in furtherance of that intent

which . . . goes beyond mere preparation.").

The Ninth Circuit en banc has adopted the common-law definition of attempt and has held that "the

elements of the crime of attempted illegal reentry into the United States under 8 U.S.C. § 1326 are: (1) the

defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent

of the Attorney General; (2) *the defendant committed an overt act that was a substantial step towards*

*reentering without that consent*; (3) the defendant was not a citizen of the United States; (4) the defendant

had previously been lawfully denied admission, excluded, deported or removed from the United States; and

(5) the Attorney General had not consented to the defendant's attempted reentry." Gracidas-Ulibarry, 231

F.3d at 1196 (emphasis added).

/ / /

1

2

**B.    The Indictment Must Be Dismissed Because It Does Not Allege an Overt Act That Was a Substantial Step Which Corroborates the *Mens Rea* of the Charged Offense.**

3      In an attempt to comply with Resendiz-Ponce, the indictment alleges that Mr. Torrez "committed

4   an overt act, to wit, crossing the border from Mexico into the United States, that was a substantial step

5   towards committing the offense."

6      However, merely stating that a particular act is a substantial step, however, does not satisfy the Ninth

7   Circuit's description of that element.  The "purpose of [the] substantial step requirement in attempt crimes

8   is to corroborate the actor's specific intent to commit the crime." Walters v. Maass, 45 F.3d 1355, 1349 (9th

9   Cir. 1995) (citing United States v. Plenty Arrows, 946 F.2d 62, 66 (8th Cir. 1991)).  Thus, the government

10  must allege and prove "culpable intent and conduct constituting a substantial step toward commission of the

11  crime that strongly corroborates that intent." United States v. DeRosa, 670 F.2d  889, 894 (9th Cir. 1982)

12  (citing United States v. Snell, 627 F.2d 186, 187 (9th Cir. 1980)).  The language employed in the

13  indictment's substantial step allegation makes no reference to *mens rea* at all.  Instead, it simply charges that

14  Mr. Torrez "committed an overt act, to wit, crossing the border from Mexico into the United States, that was

15  a substantial step towards committing the offense."   The grand jury thus did not find, nor was it asked to

16  find, "a substantial step toward commission of the crime *that strongly corroborates [the requisite] intent*."

17  See DeRosa, 670 F.2d at 894.  The indictment therefore fails to state an offense against the United States.

18     Because "[f]ailure to allege an essential element of the offense is a fatal flaw not subject to mere

19  harmless error analysis[,]" the Ninth Circuit "reverse[d] the judgment against Resendiz and direct[ed] the

20  district court to dismiss the indictment without prejudice to reindict[]." Resendiz-Ponce, 425 F.3d at 732-33

21  (citing United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999)).  Accord United States v. Pernillo-

22  Fuentes, 252 F.3d 1030, 1032 (9th Cir. 2001) (the remedy for the failure to allege an element of a section

23  1326 offense is dismissal).  Accordingly, the instant indictment must likewise be dismissed because it fails

24  to allege all essential elements of the offense of an attempted entry, in violation of 8 U.S.C. § 1326.

25     The purpose of an overt act element, in an attempt indictment, is to protect the innocent, by showing

26  that the prohibited actions must be more than just thought or "mere preparation."  See Rollin M. Perkins &

27  Ronald N. Boyce, Criminal Law § 3.A.7, at 637 (3d ed. 1982).  Without alleging an overt act the indictment

28  fails to allege an essential element, and in doing so it fails to state an offense.  This is a fatal flaw, and

1  dismissal of the indictment is required.  Du Bo, 186 F.3d at 1179.

2  **C.    The Indictment must Be Dismissed Because If Fails to Set out Both the Date of a Prior**
3  **Felony Conviction and Specific Date of Prior Removal from the United States**

4      Additionally, Mr. Torrez argues that the indictment must be dismissed because it fails to allege in

5  the indictment, in contravention to United States v. Salazar-Lopez, 506 F.3d 748 (9th Cir. 2007), *both* the

6  dates of a previous felony conviction and of a previous removal from the United States, subsequent to that

7  conviction.  The indictment here is insufficient because it only alleges that Mr. Torrez was removed from

8  the United States subsequent to one unassociated date, October 28, 2005.  It does not specifically provide

9  the date of a previous removal nor the date of any alleged previous felony conviction.  "An indictment's

10  failure to recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal

11  flaw."  United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999).  Since the indictment fails to allege

12  all of the necessary elements of the offense, it must be dismissed.

13                              **IV.**

14          **THE COURT MUST SUPPRESS ANY STATEMENTS BY MR. TORREZ**

15  **A.    The Court Must Suppress Mr. Torrez's Alleged Pre-Miranda Field Statements Because They**
16  **Were Elicited as the Result of Custodial Interrogation.**

17      The material produced thus far by the government indicates that Agent Saldana first confronted and

18  interrogated Mr. Torrez, regarding his immigration status, shortly after 4.55 a.m. in an isolated area north

19  of the International Border.  This entire interrogation proceeded any form of administration of Miranda rights

20  by the agents by approximately six hours.

21      "The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings

22  to the [subject of the interrogation]."  United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir.

23  1990).  Custodial interrogation occurs when under the totality of the circumstances the questions asked by

24  the police are reasonably likely to elicit an incriminating response from the subject.  Id.  Although questions

25  that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona,

26  "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is

27  reasonably likely to inculpate the [subject]."  Id.

28

1   In <u>United States v. Kim</u>, 292 F.3d 971, 973 (9th Cir. 2002),[2] the Ninth Circuit noted that the

2   following factors are to be considered in deciding whether or not a police-dominated atmosphere exists:

3   "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with

4   evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention;  and

5   (5) the degree of pressure applied to detain the individual." <u>Id.</u> (citations omitted); <u>see also</u> <u>United States v.</u>

6   <u>Estrada-Lucas</u>, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be

7   weighed are the language used to summon him, the physical surroundings of the interrogation, the extent

8   to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth

9   Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal

10  activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave.  <u>United</u>

11  <u>States v. Chavez-Valenzuela</u>, 268 F.3d 719, 725 (9th Cir. 2001).[3]

12  It is not necessary that an individual be physically restrained in any fashion. In <u>Beraun-Panez</u>, the

13  Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed

14  nor told that he was under arrest, was nonetheless in custody for <u>Miranda</u> purposes.  <u>Beraun-Panez</u> held that

15  "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

16  812 F.2d at 580.[4]

17  Here, the criteria for a police-dominated atmosphere as articulated in <u>Kim</u> are clearly met. Regarding

18  the language used by Agent Denning to summon Mr. Torrez, while the report does not state the exact words

19  used in identifying himself as a border patrol agent and to get Mr. Torrez into custody, whatever words used

20  clearly indicated to Mr. Torrez that Agent Denning was a law enforcement officer and that Mr. Torrez was

21  in custody. The facts that Agent Denning was in uniform carrying his gun, and in an isolated area with no

22

23  [2] In <u>Kim</u>, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily,

24  because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated

25  atmosphere." 292 F.3d at 977.  This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police.  <u>Id.</u>

26

27  [3] <u>Chavez-Valenzuela</u> involved a roadside stop of a motorist on a public street, out in the open.

28  [4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him separated from his co-worker in a remote rural area.  <u>Beraun-Panez</u>, 812 F.2d at 580.

means to escape substantiate this factor.  Additionally, Agent Denning confronted a pedestrian Mr. Torrez

while in an isolated area, enhancing any belief that Mr. Torrez would be unable to leave.

Concerning the extent to which Mr. Torrez was confronted with guilt, he was apprehended in an

isolated area, placed in the back of a border patrol vehicle, and then  immediately interrogated about his

immigration status.  It is, however, unclear how long the detention took place or the amount of pressure

applied to Mr. Torrez since Agent Denning's report does not address how long the interrogation and

detention took and only uses boiler-plate language to describe Mr. Torrez's responses. Not only did the

questioning here occur in a "police-dominated atmosphere" where Mr. Torrez was isolated, the agent's

questioning bore on Mr. Torrez's alienage, which is an element of the charged offense, 8 U.S.C. § 1326.

See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991).  This question in such a setting carried

with it implicit suspicion of criminal activity. A person, such as Mr. Torrez, subjected to such questioning

in such a situation obviously does not reasonably feel free to leave, such as in an isolated wilderness area,

is thus subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).

In the context of an encounter between border patrol and an individual near the international border,

any questioning regarding an individual's alienage falls under the rubric of custodial interrogation.

Furthermore, because of the close relationship between civil and criminal immigration investigations,

"[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be

accompanied by the Miranda warnings."  United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir.

1983).

Here, it is obvious that the information the agent elicited from Mr. Torrez, during the interrogation,

regarding his citizenship, application for permission to enter, and use of a document was "reasonably likely

to inculpate" him.  The questions served no purpose other than inculpation. They are in fact two of the four

elements that they government must prove to obtain a conviction for a violation of 8 U.S.C. § 1326.

Moreover, it is undisputed that Mr. Torrez was not read his Miranda rights at that point, nor advised that his

answers to the agent's questions could result in federal charges against him. Therefore, statements must be

suppressed.

/ / /

/ / /

**B.    Mr. Torrez Requests a Hearing Pursuant to 18 U.S.C. § 3501 Concerning The Admissibility Of Any Statements That The Government Intends to Use Against Him at Trial.**

This Court should conduct an evidentiary hearing to determine whether any statements made by Mr. Torrez's should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Torrez were voluntarily made. In addition, § 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Torrez understood the nature of the charges against him and whether he understood his rights.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings.

**V.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. TORREZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury. See CR at 10.[5] That grand jury was instructed by this Court on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. This Court's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[6] These

---

[2] "CR" refers to the Clerk's Record in Case Number 08CR1008-LAB.

[3] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

instructions compounded this Court's erroneous instructions and comments to prospective grand jurors

during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See

Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit

B.[7]

      **1.     This Court Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

responsibility, see Ex. A at 3, 3-4, 5,[8] this Court instructed the grand jurors that they were forbidden "from

judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See

id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence

may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict

because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, this Court referred

to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

     I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was this Court's discussion of the grand jurors' inability to give effect to their

disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view

of their discretion; it enforced that view on pain of being excused from service as a grand juror.

_____

   [4] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Torrez requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

   [5] See also id. at 20 ("You're all about probable cause.").

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between this Court and various prospective grand jurors, reveals how this Court's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, this Court twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is this Court's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Torrez will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

This Court made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, this Court provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say,* "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, this Court let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by this Court's use of the pronoun "I," the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, this Court's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which this Court would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, this Court drove the point home in his exchange with REA. REA first advised this Court of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. This Court first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand

juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, this Court then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, this Court made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[9]

---

[6] This point is underscored by this Court's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented

1  <u>See</u> <u>id.</u> at 27.  That is why even the "chance," <u>see</u> <u>id.</u>, that a grand juror might not vote to indict was too great

2  a risk to run.

3      **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
           Exculpatory Evidence.**

4

5      In addition to his instructions on the authority to choose not to indict, this Court also assured the

6  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  <u>See</u>

7  Ex. A at 20.[10]

8      Now, again, this emphasizes the difference between the function of the grand jury and the
       trial jury.  You're all about probable cause.  If you think that there's evidence out there that
9      might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
       you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*

10

11  ────────────────

12  with any evidence.  <u>See</u> Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each
    case because had a magistrate judge not so found, the case likely would not have been presented to the Grand
13  Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court
    "in most circumstances."  <u>See</u> <u>id.</u>  This instruction made the grand jury more inclined to indict irrespective
14  of the evidence presented.

15      [7]These instructions were provided in the midst of several comments that praised the United States
    attorney's office and prosecutors in general.  This Court advised the grand jurors that they "can expect that
16  the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act
    in good faith in all matters presented to you."  <u>See</u> Ex. A at 27.  The instructions delivered during voir dire
17  go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney,
    whatever cases they might bring," <u>see</u> Ex. B at 38, this Court affirmatively endorsed the prospective juror's
18  view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things
    you are saying.  They make sense to me."  <u>See</u> <u>id.</u> at 43.  <u>See also</u> <u>id.</u> at 40 ("You were saying that you give
19  a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the
    business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't
20  substantiate the charges against.").

21      This Court's discussion of his once having been a prosecutor before the Grand Jury compounded the
    error inherent in his praising of the government attorneys.  <u>See</u> Ex. A at 9-10.  This Court's instructions
22  implied that as a prior prosecutor and current "jury liaison judge," <u>see</u> <u>id.</u> at 8, this Court would not allow
    the government attorneys to act inappropriately or to present cases for indictment where no probable cause
23  existed.

24      In addition, while this Court instructed the Grand Jury that it had the power to question witnesses,
    this Court's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there
25  is an instance where the U.S. Attorney thinks a question ought not to be asked."  <u>See</u> Ex. A at 12.  As the
    dissent in <u>Navarro-Vargas</u> pointed out, "the grand jury's independence is diluted by [such an] instruction,
26  which encourages deference to prosecutors."  <u>Navarro-Vargas</u>, 408 F.3d at 1215.  The judge's admonition
    that his statement was only "advice," <u>see</u> Ex A at 12, does not cure the error as courts regularly presume
27  grand jurors follow instructions provided to them by the court.  <u>See</u> <u>id.</u> at 1202, n.23 ("We must presume
    that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify
28  whether they understood the instruction as given and then followed it.").

*duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, this Court gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.  Thus, this Court unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge."  See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which This Court Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[11] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same

---

[8] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

2  510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

3  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

4  prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that

5  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

6  but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

7  by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

8  Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

9  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

10  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

11  Procedure § 15.2(g) (2d ed. 1999)).

12      Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

13  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

14      The grand jury thus determines not only whether probable cause exists, but also whether to
    "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps

15      most significant of all, a capital offense or a non-capital offense -- all on the basis of the
    same facts.  And, significantly, the grand jury may refuse to return an indictment even

16      "'where a conviction can be obtained.'"

17  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

18  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

19  "controls not only the initial decision to indict, but also significant questions such as how many counts to

20  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

21  a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas

22  II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to

23  refuse to indict someone even when the prosecutor has established probable cause that this individual has

24  committed a crime." See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

25  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

26  (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

27  Ninth Circuit.  But not in this Court's instructions.

28  **C.     This Court's Instructions Forbid the Exercise of Grand Jury Discretion Established in**

**Both *Vasquez* and *Navarro-Vargas II*.**

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While this Court used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that this Court could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, this Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that this Court was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly this Court was not.

The full passage cited above effectively eliminates any possibility that this Court intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  This Court could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if this Court said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then this Court would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[12]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, this Court made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)**    The first occasion occurred in the following exchange when this Court conducted voir dire

---

[9] This argument does not turn on Mr. Torrez's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by this Court in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and this Court expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

(**2**)    In an even more explicit example of what "should" meant, this Court makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative. Court  . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that this Court's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But this Court did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(**3**) As if the preceding examples were not enough, this Court continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(**4**) And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, this Court reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, this Court advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

reasons. First, this Court did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that this Court explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. This Court's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

1    independent." Id. at 1202 (emphases in the original).

2         Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

3    'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

4    of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The

5    flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

6    making a probable cause determination ... unconstitutionally undermines the very structural protections that

7    the majority believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption of the law

8    that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

9    "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

10   in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

11   erroneous instructions because nothing will happen if they disobey them." Id.

12        In setting forth Judge Hawkins' views, Mr. Torrez understands that this Court may not adopt them

13   solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

14   Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

15        Here, again, the question is not an obscure interpretation of the word "should", especially in light

16   of the instructions and commentary by this Court during voir dire discussed above - unaccounted for by the

17   Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

18   the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

19   and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

20        This Court did not limit itself to denying the grand jurors the power that Vasquez plainly states they

21   enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

22   prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

23   Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

24   embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

25   conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

26   grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches

27   of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

28   1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and, here, this Court has both fashioned his own rules and enforced them.

**D.    The Instructions Conflict with <u>Williams'</u> Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory' judicial authority exists." <u>See id.</u> at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See id.</u> at 51-55.

Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

<u>Id.</u> (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> <u>id.</u> at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly

if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Ex. A at 20.  Thus, once again,

the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

probably unnecessary in light of the fact that this Court had already told the grand jurors that they likely

would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

you to do if they're aware of that evidence."  <u>See id.</u>  Moreover, during voir dire, this Court informed the

jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  <u>See</u> Ex. B at 14-15

(emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

to you."  <u>See</u> Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present

exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

exculpatory evidence was presented, would proceed along these lines:

(1)     I have to consider evidence that undercuts probable cause.
(2)     The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
(3)     Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## VI.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel has incomplete discovery at this time, and contemplates further motions -- especially a motion regarding the validity of the deportation -- once discovery is received and reviewed with Mr. Torrez.  Therefore, counsel requests leave to file additional motions once discovery is completed.

## VII.

## CONCLUSION

For the foregoing reasons, Mr. Torrez respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: April 28, 2008

*s/ Candis Mitchell*
**CANDIS MITCHELL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Torrez
Candis_Mitchell@fd.org